Mr. Wilkinson. Good morning, Your Honors. Thomas Wilkinson for Appellant Michael Lucht, who is with me here this morning. May I please reserve three minutes for rebuttal? That request will be granted. Thank you, Your Honor. Appellant Michael Lucht appeals the grant of summary for all counts of his complaint, because District Judge Gomez concluded as a matter of law that he had not complied with the discovery rule. We challenge that ruling for Mr. Lucht, who is a retail consumer. He sued the retailer, distributor, and wood treatment company for supposedly pressure-treated lumber that he used to build a very expensive addition and Mr. Wilkinson, you have a number of interesting arguments which you present, but I want to direct you, first of all, to your argument on the breach of contract and breach of warranty claims. You assert a claim on behalf of your client, both under common law and under the statute of limitations. One question I have on the question of whether or not the common law still survives the adoption by the Virgin Islands, the UCC, is one question, but I think the more fundamental question here as it relates to that claim is the statute of limitations. I read that VI Code Title V, Section 31, that civil actions shall be commenced within the period described for a contract action, it says six years, except when in special cases a different limitation is prescribed by statute. Doesn't the UCC therefore take that claim from six years to four years? Well, I would suggest, Your Honor, that these claims can be pursued concurrently, especially when it's a consumer-based claim as opposed to commercial entities suing each other. There is case law in the Virgin Islands, including under White v. S&E Bakery in 1991. Which we're not bound by, though. I'm sorry? We're not bound by it. You're not bound by it, but I think it does express a policy, a policy which also has been presented to the Virgin Islands Legislature that the residents here should not be deemed second-class citizens for purposes of pursuit of consumer claims, and that they should have a liberally afforded opportunity to pursue those claims. Well, it seems to me there was a very liberal opportunity afforded under the UCC here. Certainly, Mr. Luck had become aware of the rotting boards in his deck, and he did nothing more than replace them, although the lumber company where he went to replace them was aware of problems that other people were having with that lumber, and if he'd asked a simple question, he would have gotten a very complete answer on the whole problem. Well, I'm glad you raised that, Your Honor, because when he looked at and found a few boards on his outdoor deck as having been deteriorated in the 2010 timeframe during his occasional visits, that did not cause him to believe, and I would suggest would not necessarily cause many reasonable persons to believe, that hundreds of boards that had been installed at his home, including many boards who were not visible, were not subject to inspection, were all defective, and that his entire structure was It gives a reasonable person good cause to ask, you know, is this something more than just these six boards? Is this something that I need to be further concerned about? And to ask the lumber company, and they could have answered his question. They might, Your Honor, they may have answered his question. When he did pose the question to them, when he had some termite infestation in the fall of 2011, he did pose the question to them, and they acknowledged that they had a sole defective lumber. He pursued further and then spoke with a lawyer. But I would suggest that there are many reasonable people who would not leap to the conclusion that all of the hundreds of boards, including those that have no outward appearance of defect and may have been sourced from different locations, are necessarily defective. Counsel, that seems like more of a defect of degree than in kind. That is, when we've got the Van Busker case, we've got O'Brien that suggests, if you have notice that there is an issue, even if you don't know exactly what it is or you haven't linked it to causation, but you have notice that you have a sickness, that some reasonable inquiry would have gotten you more information, that that's enough for the statute of limitations to start running. Thank you, Judge Krauss, because there are circumstances where you may have a sickness, but here there is no reason to believe that the sickness necessarily applied to all of the lumber that he had purchased and which he had purchased on different occasions. Let's look at Van Busker for a moment because Judge Gomez Go back to this statement you said that the boards may have come from different origins. How does he know then that the boards that rotted came from Putnam, came from Paradise Lumber? They were all purchased from Paradise, but he didn't necessarily know that they were all distributed and treated by the same companies. Now, Paradise Why does he have Great Southern in here then? Paradise admitted Why does he have Great Southern in here if he doesn't know who treated them? Well, he did eventually learn who treated them from Paradise. Paradise admitted that the boards were defective and also concluded and advised him through litigation that the distributor was Putnam and that Great Southern was the treating company. By that time, they had numerous claims against Paradise, and Paradise had sued these other two parties for reimbursement. Paradise could have told him all about it had he but asked. There's no affidavit from Paradise to the effect that they would have told him anything. And, indeed, they didn't. Counsel. Pardon me. Yes. I'd like to finish that answer, but go ahead. Can you please address in that answer the O'Brien case, because I think it fits in very well with the question that you were just asked. Yes. There is no rule of law in the Third Circuit or in the Virgin Islands that holds that discovering a small bit of a problem with respect to numerous purchases or numerous items like this necessarily should cause a typical homeowner to conclude that everything is defective. And I do want to speak to Van Buskirk, because Your Honor raised it, and Judge Gomez completely misapprehended both the analysis and the holding in that case. He relied heavily on Van Buskirk, which is an asbestosis case. In that case, the physician advised the plaintiff seven years before a lawsuit was brought that he had asbestosis and it was caused by asbestos exposure. In 1976, the wife said, and the plaintiff was now deceased, the wife said that that was when they put two and two together between asbestos exposure and asbestosis. The case was not brought until 1978. Judge Bechtel concluded that notwithstanding that weak due diligence evidence, the case should have gone to the jury, and the Third Circuit, in a decision by Judge Arlen Adams, concluded that it was properly sent to the jury and that the plaintiff's verdict should be upheld. Here we had uncontroverted evidence, both in the deposition testimony and in Mr. Luck's affidavit, that he did not reasonably understand that this was a problem applicable to all the boards. And I think that there are many jurors out there who would draw the same conclusion. It's not a matter that should be concluded as a matter of law. It's a matter that some consumers clearly would not conclude that all of the lumber within his addition, for example, that had no outward sign of a problem was necessarily defective. You can have an outdoor deck. You can have cooling water. You can have a board here and there that you replace. It doesn't necessarily mean anything until you have more information. Mr. Wilkinson, I'm not sure that you ever answered my first question, but let me restate what I think the legal quandary here is. If you assume that the last purchase of the lumber was sometime in 2006, I wish I had a board up here. I could get up and look like a law professor. If you assume the last purchase was 2006, you filed your suit in 2013. Okay. How do you get from 2006 to 2013? And what are the legal theories that get you there? Well, I would submit that the contract theory gets you there. Let me stop you on the contract theory. The contract theory, let's assume for a second that my question on Section 31 is accurate. Even if you have common law claim surviving, that you really only have four years to get you there. That gets you to 2010. How do you get the contract? And I'll give you even six years for a second. How do you get the contract theory from 2010-2012 to 2013? I still think you have application of the discovery rule, Your Honor, under Virgin Island case law. There may not be a law. And you're relying on white. You're relying on white. Relying on white, which supersedes and is. . . It's a case that involves personal injury, right? It does. And here we have a. . . We don't have personal injury. We don't have personal injury, but we certainly have a very serious safety concern. The deck was unsafe after these reviews and had to be effectively totally replaced. And there are very serious concerns about the structural integrity of the addition as well. The total marketability of his property went down the tubes. It's unsellable. And there needs to be a consumer-based remedy for this misconduct. All right, let's assume that we found that the discovery rule does not apply under the UCC. Let's just assume that for a second. Yes, Your Honor. So that means that under your contract claims, whether it be UCC or common law, you can't get to 2013. What are you left with? I'm left primarily with the negligence theory and the consumer protection law theory. So, and your argument would be that that negligence statute begins to accrue when you had the, when your client had the, received the information from his carpenter friend, Mr. . . . Mr. Littlechild. Littlechild. Who was doing work all over the island trying to replace this defective lumber. And where he also saw termite tracks in 2011. Mr. Wilkinson, I'm going to give you an additional five minutes here. And folks on the other side, you figure out how you want to divide up an additional five minutes. Okay. I would submit, Your Honor, and particularly Judge Roth, that Mr. Lucht, who is a homeowner, who is a little bit handy with carpentry even, acted perfectly reasonably under the circumstances. There may be jurors who would conclude that he didn't act reasonably, but it's a jury question. This is a question that in Schmidt v. Scholas and in various other cases, including Neff and Joseph, where it's the collective judgment, wisdom, and experience of jurors that ultimately prevails. And there might be some people, there might be some lawyers who might think that he could have acted more promptly and more diligently or, again, drawn some conclusion that wasn't necessarily warranted. But that's a matter that's classically for the jury. And here it's particularly important because you have in the Virgin Islands a fish fee shifting rule that these defendants in this court attempted to impose on this consumer. So you have a double whammy or a whipsaw situation, to use a lumber term, where they not only can't pursue the claims but also end up burdening the fees and costs on that consumer as well. So before that kind of very serious and draconian outcome is visited on an appellant like this, he should have the opportunity to take it to the jury and to have it reviewed. All right. Judge Gomez found that your client was not diligent. But even assuming if we find that you're correct that that question should go to the jury, how do you get by the gist of the action doctrine, which was articulated as applicable by our court in the Virgin Islands under the case of Addy v. Cajar? How do you get by that? Well, the gist of the action doctrine, I don't believe that that case was in the pure consumer context. But, again, I would suggest to you. Well, Mr. Luck isn't a pure consumer either. He was adding to this house as part of buying LLC. The LLC owned the house at the time and he was going to use it as a rental property. So it was not a simple soul building his own house. It was a man developing an income-earning property down here in the Virgin Islands. He does occasionally use it as a rental property and also as a personal property, Your Honor. And it was later transferred into his own name so that he could refinance it due to all the expenses incurred in trying to deal with this problem. So I would suggest to you it's primarily a consumer issue. And if one can apply the gist of the action doctrine, the economic loss doctrine, and so forth, and you leave an individual like Mr. Luck with no remedy whatsoever, and one ought to be able to pursue a negligence theory because these parties knew they had a problem. These parties were litigating with each other over the problem. They didn't give him any notice. They didn't give him any warning. They settled that case and Judge Gomez placed the settlement under seal, kept it secret so that no proceeds could be then provided to Mr. Luck and other affected consumers. So I would again suggest that there is a good policy basis to ensure that some remedy be afforded so long as he can apply the discovery rule to his case. Mr. Wilkinson, are we dealing only with the issue of this as a good? I understand that there were two types of wood here, one that was already treated and one that involved this retreatment service. You're not arguing for the six-year statute of limitations that this was service-based, in other words, performance-based, so that six years applies under the UCC. It's only a common law six-year statute argument that you're raising? We haven't we didn't know whether this was service-based or treated at the outset. It's not something that someone like Mr. Luck would have it's not information that Mr. Luck would have access to, and it really shouldn't alter the it shouldn't shorten the statute of limitations for someone in his position. He's not the distributor purchasing from the treatment organization and providing those specifications to Great Southern. We only want our lumber serviced or treated in thus and such a fashion or to this degree. He's buying the wood on the island, expecting, as any consumer would, that it would last for 30 to 50 years. So I think there's no reason to shorten the statute of limitations as to him in his position. Thank you, Your Honor. Okay. Thank you, Mr. Wilkinson. We'll have you back on rebuttal. And Mr. Kelly? Yes, sir. Okay. May it please the Court. My name is Drew Kelly. I represent Great Southern Wood Preserving, Inc. By agreement of the parties, I'm going to address some of the common issues. You've given me a little bit more time than the others, and there are also some individualized issues which we'll be happy to address in turn. It's important to remember that all of the wood in this case, about which Mr. Luke, the appellant, complains, was purchased before December of 2006. At the time the wood was purchased, there were no express warranties. There were no representations made by anyone from Whitecap. The appellant has testified that he had no contact or no contract, didn't even know who my client, Great Southern, or Putnam, was at the time. What he did testify to was that he came in with an expectation that the wood would last for 50 years. There were no tags on the woods that identified who the treater was. There were no tags on the woods that identified how the wood was treated, no tags on the wood that identified what the proper end use for the wood was. All of these things appellant's expert has testified are required for the wood to be code compliant under the International Residential Building Code, which applies in this instance. Well, how can a simple consumer know all that? It's not that he's required to know it. The point is that he came in with an expectation, and he is trying to turn the expectation into a representation that was never made. He thought the wood was going to last 50 years. And by his own testimony, within five years, he noticed that these boards were rotten. And we're not talking about small boards. All right, that's 2011, five years. I said within five years, Your Honor. The testimony is that within five years of at least some of the purchases. I'm sorry, I keep, I guess, getting too close to the microphone. Within five years of at least some of the purchases, he realized that some of the wood was rotten and testified that he could put his foot through. And we're not talking about small pieces of wood. We're talking about two-by-six-by-twelves. And he said that every time he came down to the Virgin Islands every three months, there were a couple more. Yeah, but somewhere in the record says it was like four or five or six by that point. That he had, I think, that he had at least replaced half a dozen or so in 2010. Perhaps the bigger point is that the appellate testified that he thought every product that was sold anywhere in the United States came with a warranty. And during that period of time, he went back to the same place that he purchased this wood from, Paradise Lumber. Wasn't there at least an implied warranty of fitness? It's not that there's, nobody is arguing that there isn't an implied warranty of fitness. There are, what the argument is, is one, that he sat on his hands and didn't sue in time. And two, with respect to my client, at least, Great Southern, that there is a lack of privity and personal injury and a lack of him being a proper third-party beneficiary. But all that goes beyond the issue here. I mean, Judge Gomez really didn't get to the heart of that matter and essentially said, well, regardless of what the facts are, this case is time-barred. Correct, Your Honor. And all of the appellant's arguments are based on two assumptions, big assumptions. One is that the discovery rule applies to all of their clients, every one of them, not just the Torque Club. And although, as Your Honor pointed out, they cite no law for it, only it's unfair is basically their argument. And two, that the discovery rule actually saves all of their clients. And the most important fact in this case, in 33 pages of briefing and in ever how long he was up here arguing, they have not acknowledged the fact that their complaint in the very first paragraph states as follows. The wood was not noticeably defective and it was not until 2010 that the plaintiffs discovered that the wood was defective. In the very first paragraph of their plea, they have stated exactly what the court found that they knew in 2010. Now, less than a month later, before the response of pleadings were actually filed, they amended that complaint and they removed that sentence. But they didn't replace it with language about when they discovered. They didn't change it to say we discovered this in the fall of 2011. Okay. So the complaint was amended to delete that. They amended the complaint. They took out the time date, didn't replace it with a new time date, but did replace it with something. What they replaced it with was a statement that said equitable tolling applies. They didn't say the discovery rule applies. They couldn't. They've already admitted that they discovered the lumber. Does equitable tolling apply? It does not apply, Your Honor. Why not? Well, in the O'Shiver case, or O'Shiver, I'm not sure exactly how it's pronounced. In the O'Shiver case, this court addressed the discovery rule and also equitable tolling and found three circumstances where equitable tolling may apply. The first circumstance would be where the plaintiff was actively misled. Here we know the plaintiff has testified that he didn't ask a single question. And when he did ask, he was told. So that doesn't apply. The second is in extraordinary circumstances where maybe the plaintiff is ill. Well, you say actively misled. And I know you complain, you know, you complain on behalf of your client, perhaps rightfully so. Hey, Great Southern, we don't even know if we sold this lumber. Secondly, we only treated part of this lumber. But assuming that some of the lumber he bought came from Great Southern, he wanted to buy lumber for a deck, a deck which was outside. Now, isn't that actively misleading someone to sell them lumber that wouldn't withstand the outside conditions in the Virgin Islands? Well, the reason it's not actively misleading someone, Your Honor, is because there were no representations made. But wouldn't that be a question for the jury to make a determination? It would not be a question for the jury, Your Honor. He has admitted that everything that he thought was based on his expectation and his personal opinion. Well, it may have come from Paradise, but you were in the chain of sellers. Your Honor, we were not in the chain of sellers. He never dealt with you.  But he dealt with Paradise. And Paradise dealt with Putnam. Paradise dealt with you if some of that lumber came from you. I'll correct, Your Honor, in that Paradise did not deal with Great Southern at all. There were never any dealings between those two. But assuming Great Southern treated the lumber, which we do have our own treated lumber that we sell that contains information about how you're supposed to use it and how long it's going to last. It may have been TSO or it may have just been Yellowwood. Correct. But assume it was something. Assume there was TSO wood that Great Southern treated. There is no active misleading. There's no active misrepresentation about anything, Your Honor. Let's suppose Paradise actively misled by selling him the wrong lumber. Can't that be attributed to you? No, it can't, Your Honor. We didn't even know Paradise was selling this lumber. We didn't know where the lumber was going and what it was going to be used for. So you're basically saying equitable tolling can't be used to toll the claim against your client. Absolutely it cannot. And, Your Honor, the active misleading of the equitable tolling is a different situation than what you're talking about. It's a situation where they've been actively misled about whether they have a cause of action. Hey, can I sue you for this? Oh, no, you can't sue for this reason. It's a different scenario. When we're dealing with a consumer and reasonable expectations of that consumer, can't the very act of selling purportedly for the purpose to which the consumer wants to put that wood constitute an active misrepresentation? It can't, Your Honor. That's what the UCC is here for. There's been no dispute that the UCC applies here. That's what Gomez ruled. They have not challenged that. The UCC is in place for a number of reasons, including uniformity, predictability, and finality. Well, they argue as to contract that there is a parallel claim to be brought. Well, Your Honor, the Third Circuit says otherwise. And quite frankly, the courts in the Virgin Islands that have actually addressed the issue have said otherwise, too. The White case never even got to that issue. Plus, it did involve a personal injury, as Your Honor has pointed out. But the bottom line is it's not that he didn't have a remedy. Mr. Kelly, if you want to use that additional time, you can. Okay, I'll just use an additional minute and give the rest to the others. On the jury question issue, Your Honor, every case that they cited for the proposition that this is a jury question was a case, either a situation where there was a medical issue and there was an unsophisticated plaintiff who was charged with deciphering things that doctors had said, or the only other case they've cited was a case where there was a fiduciary duty involved in shareholder derivative action and the court said, hey, you know, you could sit back more because the fiduciary duty, you were entitled to trust that relationship to where a smoking gun is actually required. The cases, this court has ruled on a number of occasions that this can be and is a question for the court. The O'Brien case, as Your Honor referred to, specifically puts them on the duty of reasonable inquiry. Obviously, there was no inquiry here. The Brawner case, which Judge Roth was involved with, these are cases that apply. Finally, on the gist of the action, they've made no argument, Your Honor. They've cited no case law. The Addy case makes clear that the gist of the action applies in the Virgin Islands and the gist of this action was a contract. Let me pose this question on the Addy case. You know, the gist of the action doctrine is not uniformly applicable across the country. There aren't a lot of states that have applied that doctrine. We've predicted that it would be applied in Pennsylvania, and I think that's an accurate prediction. I don't really find any fault with our prediction in Addy that it would be applied, at least under the facts in Addy and the Virgin Islands. But isn't this case a little bit different than Addy in that I think what the appellant's trying to argue here is that this is a product liability case, and a product liability case is couched in various theories, including a negligence theory, and that because of the special nature of a product liability case, the gist of the action doctrine shouldn't be applied just because there may have been an underlying contract. Your Honor, obviously the – I'm sorry, are you ready for me? No, I'm done. Okay. Obviously the Addy case was not a case involving a product. It was a case involving a land transaction. Right. And there was actually an allegation of fraud in that case, which we do not have. Plus, the gist of the action is very similar, at least in operation, to the economic loss doctrine, which is undisputed applies in the products liability world. In effect, the application of the economic loss doctrine does the same thing, and that is it basically states where there's an injury to the product itself and there's not a personal injury, that this is a claim for contract, and it is a claim that in this instance the UCC applies in bars. Thank you very much. All right. Okay. Thank you, Mr. Kelly. And Mr. Moskowitz. Thank you. Good morning, ladies and gentlemen of the Court, Your Honor. May it please the Court. Alex Moskowitz on behalf of Paradise Lumber, Whitecap Investment Corporation. One of the fundamental issues that were here before the Court is the question of the dichotomy between questions of law and questions of fact. In the summary judgment opinion issued by Judge Gomez, contrary to the allegations by the appellant, the Court did not make many decisions on the facts. It relied on the law and the Court's determination of what law applies and how it applies to the case, not necessarily the facts of the case. And one of the ways we see that is the application of Judge Gomez's opinion to the determination of when the statute of limitation starts to run for the UCC claims under 2275, the version of which is called the BIC UCC version. Paradise's position on this is that the Court made an accurate analysis of those legal determinations. The question about whether or not there was reasonable diligence, whether or not the discovery rule applies, the specific terms of the statute which the Court is duty-bound to interpret don't even allow us to get to those questions of fact. And Judge Gomez's opinion is solid on those issues. The UCC specifically says it does not matter what the plaintiff, in this case, knew, but whether at when the claim accrued. And under the UCC, the claims accrued at the latest in 2010. But the discovery rule, the way we've discussed it, for example, in the William A. Graham Company v. Howey case, is one that can be viewed as not a rule of when it accrues, but a tolling rule. And we've said that that's the preferable way to look at it. If you think of it that way, that there is a date of accrual at the time of injury, but there's a tolling as a result of the discovery rule, why isn't that reading consistent with the language of the restatement? Your Honor, I think the first basis, and to step back under the Virgin Islands law, 1 V.I.C. Section 4 has been ---- Mr. Moss, keep yourself close to that. I apologize, Your Honor. That's okay. 1 V.I.C. Section 4, which is the body of law that used to say that the restatement was the go-to provisions to determine what the law is in the Virgin Islands, has roundly been eviscerated by the Virgin Islands Supreme Court. Based upon those rulings, and there are numerous ones from the Supreme Court saying that the Supreme Court of the Virgin Islands is the determining body that's going to determine the law, not the restatements. One of the things that we have to look at and we're bound to look at in these matters is what is the legislator set out for the duties, the rights, and the obligations of parties when it comes to litigation. And they did that clearly in this matter by the words they used and the words that Judge Gomez interpreted under 2275. Specifically, that statute talks about it doesn't affect tolling. It doesn't affect tolling. But Judge Gomez did a very, very succinct analysis of the traditional distinction between equitable tolling and the discovery rule. And if you back that up one step further, you have that same statute that says it doesn't affect the law on tolling, but it doesn't matter what the plaintiff knew, which talks specifically to the question of the discovery rule and its applicability to the statute of limitations on UCC-based plaintiffs. But the statute language isn't about tolling. It says that the contract claim accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. That date of accrual, why isn't that consistent with our case law that talks about the discovery rule as essentially a tolling rule? But if the legislature was using it in the same way, then talking about an accrual date isn't inconsistent with the functioning of a discovery rule, is it? That's a very good question, Your Honor, and one that I would suggest that the words used in the statute are to be given their plain meaning under basic canons of statutory construction. We look at tolling as it's used in the statute, and we look at the underpinnings of the discovery rule, and I believe those are inconsistent analyses. You can't, on the one hand, say that the discovery rule doesn't apply and then bring it back in later. It's an inconsistency within the law and one that I would suggest wasn't intended by the legislature when they wrote that statute. Again, this goes back to the question of consistency and the fundamental purpose of the UCC. I guess, though, that the other argument to that would be that, well, Clause 2 doesn't seem to allow for a discovery rule, but Clause 4 clearly says that the section does not alter the law on tolling in the statute of limitations, and within that law on tolling are various doctrines, one of which is a discovery rule and one of which is equitable tolling. I would agree with Your Honor, but, again, this is a question of a conflict within a statute itself, and how do you reconcile that? And I believe that Judge Gomez's opinion did an excellent job of talking about the history of the discovery rule and did a very, very, very clean analysis on what are the distinctions and what was the intent of the legislature when they crafted this rule. And, again, this goes back to the question of uniformity, consistency, and a foundation in which businesses can do business throughout the country and be secured in their understanding of the law. Let me just, since you represent Paradise, and it's more clear from the record that Mr. Luck at least had some dealings with Paradise Lumber, why isn't there a question here on the implied warranty of fitness? I mean, you know, he may have dealt through a contractor, but clearly either he or his agent let you know that they wanted to buy lumber that was good for a deck in the Virgin Islands. And why wouldn't the implied warranty of fitness exist here? And couldn't that provide some life to this claim? The record establishes that when Mr. Luck and his designees purchased lumber from Whitecap, he did not make any representations to Whitecap about what the wood was going to be used for. He didn't seek their recommendation for the type, quality, quantity, size, grade, or otherwise of the lumber that he needed for his particular purpose. The question of what they were selling the lumber for is an internal expectation and an internal understanding that Mr. Luck and his contractors never expressed to Whitecap. The way Whitecap is set up, there's a big lumber yard in the back, and the people go and pull whatever they need, and they take a ticket and write it up, and off they go. They could be building a deck. They could be building garden boxes. They could be building a birdhouse. Whitecap wouldn't have any knowledge of that. If Mr. Luck walked in like I would walk in, I'd say, hey, look, I'm building a deck. What kind of lumber do I need? And the person at the desk would say, oh, we've got some lumber out there in shed number six, but we've got to get it treated. Yeah, okay, I want to build a deck. That's not in the record. That's correct, Your Honor. That's not in the record? The record specifically says that Mr. Luck never had any conversations with Whitecap, Paradise, their representatives, or otherwise with regard to the use, the quality, or otherwise of the wood. And there's nothing in the record to indicate that Whitecap knew what he was buying the lumber for? There's no evidence of that, Your Honor, and given the fact that there are numerous people who come in, both sophisticated, unsophisticated, with projects of every varying nature, to try to impute knowledge onto Whitecap as to what an individual consumer is going to use a piece of wood for is no more reasonable than trying to ask somebody what fish is swimming by 1,000 yards out. Okay, all right. Thank you, Your Honor. Thank you, Mr. Moskowitz. And Mr. Carlson. Mr. Honor, may I please report? Robert Carlson for Putnam Lumber and Export Company and Putnam Family Properties, Inc. They are alleged to be the distributor of the lumber, and they are the link between Great Southern and Whitecap. As to the privity arguments, they are much akin to Great Southern's arguments because there was no actual direct privity between the appellants and my clients. That's important for the breach of warranty claims because, as you know, the breach of warranty claims require some express representation from Putnam, which there's no evidence of in the record, or personal injury. Now, an important distinction, too, is the Deceptive Trade Practices Act claim. That's on appeal as a result of Jeff Goldman's judgment. If you could try to stay towards that side of the podium. I'm trying not to hit the microphone, Your Honor. Okay. The Deceptive Trade Practices Act, that's on appeal. However, as to my clients. What is on appeal? The Deceptive Trade Practices Act claim. Right, yes. As to my clients, we received a motion to dismiss on that claim in February. That appealed. Correct. Correct. And the court found that the appellants were not customers of my client. As to the UCC, the application of UCC claims and the discovery rule, the court in the Third Circuit has routinely refused to apply the discovery rule to UCC claims, and the Virgin Island courts have as well. Your Honor, was a decision decided by the Virgin Islands Territorial Court, which refused to apply the discovery rule to UCC claims, finding that the claim accrues when the breach occurs, which is the sale. And in this case, that occurred in the latest, 2006. As to the White case, I think it's somewhat of an outlier matter. It's a personal injury case and has never been cited to, as far as I can tell, by any other court, Virgin Islands or otherwise. And it contradicts Feinbaum and Toadman, Your Honor, which clearly say that the UCC claims cannot be brought in combination with the common law breach contract claims. They carry a four-year statute of limitations and that there's no application of the discovery rule. That's what we have here. As to the discovery rule in general, because I think that potentially could be applicable to the negligence claims, the courts have discussed that there's a burden on the plaintiff to evidence some reasonable investigation. And setting aside the fact that their own complaint sets forth they discovered the rule was defective in 2010, if we take a plaintiff's argument that they knew of issues in 2010, yet it wasn't to a happenstance dinner with a carpenter friend that he learned of his accrual, the only thing he learned in 2011 was the affirmation of what he learned in 2010. He learned that other people may have had the same problems that he had. But didn't what he actually learned at that point, why isn't it the vast extent of the problem? Can't you have a change in degree that is so fundamental that it makes it a change in kind? You can know you're sick but have no idea of what it is or reason to think that there's a cause because you think it's some very small thing and it turns out that it's far more widespread and that would trigger a duty of inquiry that might not have been triggered earlier. I can foresee examples where that could be the case, but that's not here. After that meeting, nothing in that meeting forced the appellant or caused the appellant to learn of anything new. He did not learn of anything new in his house. There's no evidence in the record that he conducted any investigation on his own property. There's no investigation, there's no evidence in the record that after 2011 he found any other boards on his house that were defective, that he hired any experts to look at his house, that he did anything other than go to Paradise Lumber the following day to learn that there were issues. And importantly, even if you assume it's 2011, there's no evidence that he did any investigation whatsoever and he still waited until 2013 to bring his lawsuit. There's no evidence that he learned anything new about his own damage. All he learned was that he potentially could have a lawsuit because other people on the island might have had the same issue. Nothing new was learned as to the scope of his injuries or the fact that he had injuries. And he still waited until 2013 to file his lawsuit. Okay. Thank you, Your Honor. All right, Mr. Carlson, thank you. And Mr. Wilkinson on rebuttal. Thank you, Your Honor. With respect to that last point, in fact, he did notice in the fall of 2011 that he had some termite infestation, which was quite alarming and hadn't been noticed before, and it was one reason why he raised the issue with Mr. Littlechild, who was very busy replacing this lumber around the island. While Judge Gomez referred to the governing standard, which is that only where the facts are so clear that reasonable minds cannot differ may it be determined as a matter of law, he really did not apply that standard in the consumer context. And with respect to the issue Your Honor raised under the UCC, Section 2-725, the discovery rule is indeed just one facet of tolling. It's just one aspect of tolling. And Judge Gomez's conclusion that only equitable tolling could apply here, certainly not something that one determines by easy review of the dis- But in reviewing and statutory interpretation, is not the specific reference trumped the general? Certainly that can be true, but discovery rule is just one aspect of tolling. It could have said equitable tolling. When you have a specific reference that the injury accrues, the case accrues when the injury occurs, does that not trump a later general reference to overall tolling? No. I understand that Justice Scalia in reading the law might draw that conclusion, but my suggestion to Your Honor is that here, there was the savings clause at the end. So you're saying that there's a case where a general reference trumps a specific one? Not while I'm standing here, Your Honor, but I would suggest that the last phrase preserves any type of tolling, and the fact that the matter accrues is quite different from whether the matter is tolled or the discovery rule extends that the end date. Accrual, obviously, is different from the end date. So I would simply ask Your Honors to reverse with respect to the erroneous discovery rule ruling here and remand to Judge Gomez for further proceedings consistent with that ruling. Thank you very much. Mr. Kelly, before you sit down, could you just address briefly the Deceptive Trade Practices Act claim? Yes. Judge Gomez concluded that deceptive trade practices of consumer protection law necessarily meant that we're speaking about fraud. We're not necessarily speaking about fraud because fraud is not a requirement in order to demonstrate entitlement to recovery under that rule. So, therefore, a two-year statute of limitations is not necessarily going to be the governing analogy. Here, as we noted in the White case, which was not refuted in later cases, expressly provided for a six-year statute of limitations, and these defendants all stipulated that a six-year statute of limitations applied in the briefing below. It was only Judge Gomez who divined that it was a two-year statute instead and tried to foreclose this remedy. What about the question of clear evidence that the legislature intended for the change in the law to revive these expired claims? You're speaking about the 2013 amendments? Yes. There is very little, unfortunately, in the way of legislative history. We looked for legislative history, and one could say, well, it must have necessarily meant a desire to change and lengthen the statute, or did it necessarily mean a clarification to confirm that that's what it always should have been and that other courts had perhaps reached the erroneous conclusion that it was a shorter period of limitations. I think you could go either way when you look at the statutory history and look at the language of the change of that law in the 2013 amendments. But from our perspective, it expressed a policy which was not to shortchange consumers in this type of position and to liberally apply the available remedies. And in doing so, you would conclude that the six-year statute should apply to Mr. Luck's claim. Once again, thank you very much. Thank you. Thank you, Mr. Wilkinson. And we thank all counsel for a case that was very well briefed and argued, and we will take the matter under advisement.